(Slip Opinion) OCTOBER TERM, 2024     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BARNES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF BARNES, DECEASED *v.* FELIX ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–1239. Argued January 22, 2025—Decided May 15, 2025

Respondent Roberto Felix, Jr., a law enforcement officer, pulled over Ashtian Barnes for suspected toll violations. Felix ordered Barnes to exit the vehicle, but Barnes began to drive away. As the car began to move forward, Felix jumped onto its doorsill and fired two shots inside. Barnes was fatally hit but managed to stop the car. About five seconds elapsed between when the car started moving and when it stopped. Two seconds passed between the moment Felix stepped on the doorsill and the moment he fired his first shot.

  Barnes's mother sued Felix on Barnes's behalf, alleging that Felix violated Barnes's Fourth Amendment right against excessive force. The District Court granted summary judgment to Felix, applying the Fifth Circuit's "moment-of-threat" rule. The Court of Appeals affirmed, explaining that the moment-of-threat rule requires asking only whether an officer was "in danger at the moment of the threat that resulted in [his] use of deadly force." 91 F. 4th 393, 397. Under the rule, events "leading up to the shooting" are "not relevant." *Ibid.* Here, the "precise moment of threat" was the "two seconds" when Felix was clinging to a moving car. *Id.*, at 397–398. Because Felix could then have reasonably believed his life in danger, the panel held, the shooting was lawful. *Id.*, at 398.

*Held*: A claim that a law enforcement officer used excessive force during a stop or arrest is analyzed under the Fourth Amendment, which requires that the force deployed be objectively reasonable from "the perspective of a reasonable officer at the scene." *Graham* v. *Connor*, 490 U. S. 386, 396. The inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." *County of Los Angeles* v. *Mendez*, 581 U. S. 420, 427–428; *Tennessee* v. *Garner*, 471 U. S.

1, 9. That analysis demands "careful attention to the facts and circumstances" relating to the incident. *Graham*, 490 U. S., at 396.

Most notable here, the "totality of the circumstances" inquiry has no time limit. While the situation at the precise time of the shooting will often matter most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Prior events may show why a reasonable officer would perceive otherwise ambiguous conduct as threatening, or instead as innocuous. *Plumhoff* v. *Rickard*, 572 U. S. 765, well illustrates this point. There, an officer's use of deadly force was justified "at the moment" partly because of what had transpired in the preceding period. *Id.*, at 777.

The moment-of-threat rule applied below prevents that sort of attention to context, and thus conflicts with this Court's instruction to analyze the totality of the circumstances. By limiting their view to the two seconds before the shooting, the lower courts could not take into account anything preceding that final moment. So, for example, they could not consider the reasons for the stop or the earlier interactions between the suspect and officer. And because of that limit, they could not address whether the final two seconds of the encounter would look different if set within a longer timeframe. A rule like that, which precludes consideration of prior events in assessing a police shooting, is not reconcilable with the fact-dependent and context-sensitive approach this Court has prescribed. A court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders.

The Court does not address a separate question about whether or how an officer's own "creation of a dangerous situation" factors into the reasonableness analysis. The courts below never confronted that issue, and it was not the basis of the petition for certiorari. Pp. 4–9.

91 F. 4th 393, vacated and remanded.

KAGAN, J., delivered the opinion for a unanimous Court. KAVANAUGH, J., filed a concurring opinion, in which THOMAS, ALITO, and BARRETT, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 23–1239

JANICE HUGHES BARNES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ASHTIAN BARNES, DECEASED, PETITIONER *v.* ROBERTO FELIX, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 15, 2025]

JUSTICE KAGAN delivered the opinion of the Court.

A police officer's use of deadly force violates the Fourth Amendment when it is not "objectively reasonable." *Graham* v. *Connor*, 490 U. S. 386, 397 (1989). And that inquiry into reasonableness, we have held, requires assessing the "totality of the circumstances." *Id.,* at 396 (quoting *Tennessee* v. *Garner*, 471 U. S. 1, 9 (1985)).

The question here is whether that framework permits courts, in evaluating a police shooting (or other use of force), to apply the so-called moment-of-threat rule used in the courts below. Under that rule, a court looks only to the circumstances existing at the precise time an officer perceived the threat inducing him to shoot. Today, we reject that approach as improperly narrowing the requisite Fourth Amendment analysis. To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment.

I

On the afternoon of April 28, 2016, Roberto Felix, Jr., a

law enforcement officer patrolling a highway outside Houston, received a radio alert about an automobile on the road with outstanding toll violations. Felix soon spotted the car, a Toyota Corolla, and turned on his emergency lights to initiate a traffic stop. The driver, Ashtian Barnes, pulled over to the highway's shoulder.

Parking his own car just behind, Felix walked to the Corolla's driver-side door and asked Barnes for his license and proof of insurance. Barnes replied that he did not have his license with him, and that the car was a rental in his girlfriend's name. As he spoke, Barnes rummaged through some papers inside the car, causing Felix to tell him several times to stop "digging around." Felix also commented that he smelled marijuana, and asked if there was anything in the car he should know about. Barnes responded that he might have some identification in the trunk. So Felix told him to open the trunk from his seat. Barnes did so, while also turning off the ignition. All that happened (as a dashcam recording of the incident shows) in less than two minutes.

Then things began moving even faster. With his right hand resting on his holster, Felix told Barnes to get out of the car. Barnes opened the door but did not exit; instead, he turned the ignition back on. Felix unholstered his gun and, as the car began to move forward, jumped onto its doorsill. He twice shouted, "Don't fucking move." And with no visibility into the car (because his head was above the roof), he fired two quick shots inside. Barnes was hit, but managed to stop the car. Felix then radioed for back-up. By the time it arrived, Barnes was dead. All told, about five seconds elapsed between when the car started moving and when it stopped. And within that period, two seconds passed between the moment Felix stepped on the doorsill and the moment he fired his first shot.

Barnes's mother, Janice Barnes, sued Felix on her son's behalf. The suit, brought under 42 U. S. C. §1983, alleged

that Felix had violated Ashtian Barnes's Fourth Amendment rights by using excessive force against him.

The District Court granted summary judgment to Felix. The court explained that to prevail on her claim, Mrs. Barnes needed to show that Felix's use of force was "objectively unreasonable." 532 F. Supp. 3d 463, 468 (SD Tex. 2021). In the usual excessive-force case, the court noted, the inquiry into reasonableness would involve considering a variety of circumstances. See *id.,* at 468–469. But when an officer has used *deadly* force, the court continued, "the Fifth Circuit has developed a much narrower approach." *Id.,* at 469. Then, a court could ask only about the situation existing "*at the moment of the threat*" that sparked the fatal shooting. *Ibid.* (quoting *Rockwell* v. *Brown*, 664 F. 3d 985, 991 (CA5 2011); emphasis in original). The District Court identified that moment as "the two seconds before Felix fired his first shot," when he was standing on the doorsill of a moving vehicle. 532 F. Supp. 3d., at 471. At that moment, the court found, an officer could reasonably think himself "at risk of serious harm." *Id.,* at 472. And under the Fifth Circuit's rule, that fact alone concluded the analysis. The court explained that it could not consider "what had transpired up until" those last two seconds, including Felix's decision to jump onto the sill. *Id.,* at 471. Although a "more robust examination" might have aided in assessing the reasonableness of the shooting, the court was "duty bound" by "Circuit precedent" to "limit[ its] focus" to the "exact moment Felix was hanging onto Barnes's" moving car. *Id.,* at 472.

The Court of Appeals affirmed, explaining that it too was "[b]ound" by "this Circuit's moment of threat doctrine." 91 F. 4th 393, 394, 397 (2024). Under that rule, the panel agreed, the "inquiry is confined to whether the officer[]" was "in danger at the moment of the threat that resulted in [his] use of deadly force." *Id.,* at 397. Any prior events "leading up to the shooting," including actions the officer

4   BARNES *v.* FELIX

Opinion of the Court

took, were simply "not relevant." *Ibid.* (quoting *Harris* v. *Serpas*, 745 F. 3d 767, 772 (CA5 2014)). And here, as the District Court found, the "precise moment of the threat" was the "two seconds" when Felix was clinging to a moving car. 91 F. 4th, at 397–398. Because Felix could then have reasonably believed his life in danger, the panel concluded, his decision to shoot "did not violate Barnes's constitutional rights." *Id.,* at 398.

In a concurring opinion, Judge Higginbotham (who also authored the panel opinion) expressed "concern" with the Fifth Circuit's moment-of-threat doctrine. *Ibid.* He thought that rule inconsistent with this Court's directive to assess the reasonableness of an officer's use of force, including deadly force, by "look[ing] to the totality of circumstances." *Id.,* at 399. Under the totality approach, Judge Higginbotham wrote, a court could consider not just the "precise millisecond" when an officer deploys force, but everything that "ha[d] transpired up until" that time. *Ibid.* And with that wider focus, Judge Higginbotham would have found that Felix's shooting of Barnes was unreasonable. See *id.,* at 401.

We granted certiorari to address whether, in resolving Fourth Amendment excessive-force claims, courts may apply the moment-of-threat rule just described. See 603 U. S. ___ (2024). We hold they may not because that rule constricts the proper inquiry into the "totality of the circumstances."

II

A claim that a law enforcement officer used excessive force during a stop or arrest is "analyzed under the Fourth Amendment." *Graham*, 490 U. S., at 395; see Amdt. 4 (applying to "seizures" of "persons"). The "touchstone of the Fourth Amendment is 'reasonableness,'" as measured in objective terms. *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). So the question in a case like this one, as this Court

has often held, is whether the force deployed was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake. *Graham*, 490 U. S., at 396; *County of Los Angeles* v. *Mendez*, 581 U. S. 420, 428 (2017).

That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." *Id.,* at 427–428; *Garner*, 471 U. S., at 9. There is no "easy-to-apply legal test" or "on/off switch" in this context. *Scott* v. *Harris*, 550 U. S. 372, 382–383 (2007). Rather, the Fourth Amendment requires, as we once put it, that a court "slosh [its] way through" a "factbound morass." *Id.,* at 383. Or said more prosaically, deciding whether a use of force was objectively reasonable demands "careful attention to the facts and circumstances" relating to the incident, as then known to the officer. *Graham*, 490 U. S., at 396. For example, the "severity of the crime" prompting the stop can carry weight in the analysis. See *ibid.*; *Garner*, 471 U. S., at 11. So too can actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter. See *id.,* at 12; *Kingsley* v. *Hendrickson*, 576 U. S. 389, 397 (2015). And the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others. See *ibid.*; *Graham*, 490 U. S., at 396.

Most notable here, the "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in

which they arose." Brief for United States as *Amicus Curiae* 14. Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

The Court's decision in *Plumhoff* v. *Rickard*, 572 U. S. 765 (2014), well illustrates the point. The excessive-force claim there concerned the fatal shooting of a driver at the end of a "dangerous car chase" lasting more than five minutes. *Id.,* at 768. The driver had sped away from a traffic stop on a well-used road, and tried to outrun as many as six police cruisers at speeds sometimes exceeding 100 miles per hour. Eventually, the fleeing car ran into one of the cruisers and came "to a near standstill." *Id.,* at 776. The driver, though, still tried to escape, pumping the gas in a way that sent his wheels "spinning" and then putting the car into reverse. *Ibid.* At that point, one of the officers fired several shots into the car. In a suit brought against the officer, the driver's daughter contended that those shots were taken when the chase was "already over." *Id.,* at 777. But this Court rejected that claim based on everything that had happened during the incident—the driver's "outrageously reckless" behavior over the prior "five minutes," as well as his last-second efforts to again take flight. *Id.,* at 776. Given all of those events, the Court explained, a reasonable officer would have concluded that the driver was "intent on resuming" his getaway and, if allowed to do so, would "again pose a deadly threat for others." *Id.,* at 777. In short, the shooting was justified "at the moment" it occurred partly because of what had transpired in the preceding period. *Ibid.*

The moment-of-threat rule applied in the courts below prevents that sort of attention to context, and thus conflicts with this Court's instruction to analyze the totality of the circumstances. Recall that the District Court and Fifth Circuit limited their view to the two seconds before the shooting, after Felix had stepped onto the doorsill of Barnes's car. See *supra,* at 3–4. Those courts believed that, under Fifth Circuit precedent, they could not take into account anything preceding that final moment. See 532 F. Supp. 3d, at 471 (excluding analysis of "what had transpired up until the shooting itself"); 91 F. 4th, at 397 (agreeing that "actions leading up to the shooting are not relevant"). So, for example, they could not consider the reasons for the stop or the earlier conduct of, and interactions between, the suspect and officer. And because of that limit, they could not address whether the final two seconds of the encounter would look different if set within a longer timeframe. It is as though the Court in *Plumhoff* could consider only the instant when the chased car was at a "near standstill," and not the earlier time when it zigzagged down a busy roadway at speed. 572 U. S., at 776. To be sure, historical facts will not often matter as much as they did there to the reasonableness analysis. See *supra,* at 6. And some of those facts may not be relevant at all. But no rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-dependent and context-sensitive approach we have prescribed. A court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders.

That point is so evident that not even Felix quarrels with it; his defense of the decisions below instead relies on taking a different view of their meaning and of the question they raise. First, the agreement with what we have said: Yes, Felix acknowledges, prior events are not "off limits" in the reasonableness inquiry, for they may "inform the perspective of the reasonable officer." Tr. of Oral Arg. 79; Brief for

Respondent 2. Just so. But now the divergence: According to Felix, the courts below acted consistently with that all-times-considered principle. The Fifth Circuit's moment-of-threat doctrine, Felix argues, in fact allows courts to assess many pre-shooting facts and circumstances—and courts applying it often do so. See *id.,* at 20 (citing other Fifth Circuit decisions). All that the doctrine bars is a single kind of inquiry—into whether an officer's earlier error itself "created the need for deadly force." *Id.,* at 21; see Tr. of Oral Arg. 53. And on that issue, Felix submits, the Fifth Circuit is right: "[A]n officer doesn't lose his right to defend himself just because" he previously "made a mistake." *Ibid.*

But whatever might be said of Fifth Circuit law generally, the decisions below applied a rule about timing. As shown above, both lower courts took pains to explain that, in evaluating the shooting's reasonableness, they could look only to a two-second snippet of the encounter. See *supra,* at 3–4. And because that was the reasoning in the case before us, that is the reasoning we must address. It could make no difference to our decision here if the Fifth Circuit in other cases eschewed a strict time limit, as Felix claims. And anyway, we are not sure Felix correctly describes the overall state of Fifth Circuit law. Consider *Harris* v. *Serpas*—a Fifth Circuit decision relied on below. See 91 F. 4th, at 397. The court there noted the plaintiffs' recital of several historical facts—actions of both the suspect and the officer in the period prior to the shooting. See 745 F. 3d, at 772. And the court recognized that this Court's decisions directed an inquiry into the "the 'totality of the circumstances.'" *Ibid.* (quoting *Graham*, 490 U. S., at 396). But then came the following: "This [Circuit], however, has narrowed that test" in deadly force cases, holding that the inquiry there is "confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting." *Ibid.* (alterations in original). The

problem with the statement is apparent. As we have explained, a court cannot thus "narrow" the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too, in this and all excessive-force cases, at any relevant events coming before.

   We do not address here the different question Felix raises about use-of-force cases: whether or how an officer's own "creation of a dangerous situation" factors into the reasonableness analysis. Brief for Respondent 22; see *supra,* at 8. As in another of our recent Fourth Amendment cases, that issue is not properly before us. See *Mendez,* 581 U. S., at 429, n. The courts below never confronted the issue, precisely because their inquiry was so time-bound. In looking at only the two seconds before the shot, they excluded from view any actions of the officer that allegedly created the danger necessitating deadly force. See *supra,* at 3–4. So, to use the obvious example, the courts below did not address the relevance, if any, of Felix stepping onto the doorsill of Barnes's car. And because they never considered that issue, it was not the basis of the petition for certiorari. The question presented to us was one of timing alone: whether to look only at the encounter's final two seconds, or also to consider earlier events serving to put those seconds in context.

   With that matter resolved, we return everything else to the courts below. It is for them now to consider the reasonableness of the shooting, using the lengthier timeframe we have prescribed.

   Accordingly, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

                              *It is so ordered.*

Cite as: 605 U. S. ____ (2025)  1

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 23–1239

JANICE HUGHES BARNES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ASHTIAN BARNES, DECEASED, PETITIONER *v.* ROBERTO FELIX, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 15, 2025]

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS, JUSTICE ALITO, and JUSTICE BARRETT join, concurring.

I join the Court's opinion. I agree that the officer's actions during the traffic stop in this case should be assessed based on the totality of the circumstances. I write separately to add a few points about the dangers of traffic stops for police officers, particularly when as here the driver pulls away in the midst of the stop.

Even for routine traffic violations, traffic stops are "fraught with danger to police officers." *Michigan* v. *Long*, 463 U. S. 1032, 1047 (1983). An "inordinate risk confront[s] an officer as he approaches a person seated in an automobile." *Pennsylvania* v. *Mimms*, 434 U. S. 106, 110 (1977) (*per curiam*). That is in part because officers operate at a "tactical disadvantage" when "approaching an unknown vehicle, with limited visibility and unpredictable threats." Brief for National Fraternal Order of Police as *Amicus Curiae* 4. As this Court noted nearly 50 years ago, "a significant percentage of murders of police officers occurs when the officers are making traffic stops." *Mimms*, 434 U. S., at 110 (quoting *United States* v. *Robinson*, 414 U. S. 218, 234, n. 5 (1973)). Traffic stops remain highly dangerous today. See Dept. of Justice, Federal Bureau of

2        BARNES *v.* FELIX

KAVANAUGH, J., concurring

Investigation, Law Enforcement Officers Killed and Assaulted, 2023 (2024) (Table 27). On April 8, 2023, two officers were shot and killed at an intersection in Cameron, Wisconsin, after stopping a car for a warrant and welfare check on the driver.[1] On December 8, 2024, an officer was shot and killed after he pulled over a pickup truck with expired license plates in a Super 8 motel parking lot in Terrell, Texas. See Brief for State of Texas et al. as *Amici Curiae* 1, and n. 4. The list goes on and on.[2]

Officers cannot let their guard down and assume that any particular traffic stop will be safe—even if a driver is pulled over for nothing more than a speeding violation, a broken taillight, or the like. The driver may be drunk, on drugs, armed, or some combination thereof. Or the driver may have committed (or may be about to commit) a serious crime. "People detained for minor offenses" such as ordinary traffic violations "can turn out to be the most devious and dangerous criminals." *Florence* v. *Board of Chosen Freeholders of County of Burlington*, 566 U. S. 318, 334 (2012). Timothy McVeigh, the man responsible for the 1995 Oklahoma City bombing, was stopped for a missing license plate, which ultimately led to his apprehension for the bombing. See *ibid.* Likewise, serial killer Ted Bundy was pulled over based on a stolen-vehicle alert in Pensacola, Florida. When informed that he was under arrest, Bundy kicked the officer's legs out from under him, and the two struggled over the officer's gun before the officer was able

---

[1] See Officer Down Memorial Page, Police Officer Emily Ann Breidenbach, https://www.odmp.org/officer/26693-police-officer-emily-ann-breidenbach; Officer Down Memorial Page, Police Officer Hunter Timothy Scheel, https://www.odmp.org/officer/26694-police-officer-hunter-timothy-scheel.

[2] To be sure, officers sometimes use excessive force during traffic stops. When that happens, officers of course should be held to account for their actions. See Brief for Current and Former Law Enforcement Officials as *Amici Curiae* 22; Brief for California State Sheriffs' Association et al. as *Amici Curiae* 10.

to subdue and arrest Bundy. See *Bundy* v. *Dugger*, 850 F. 2d 1402, 1422 (CA11 1988); see also Brief for State of Texas et al. as *Amici Curiae* 11–12, and n. 12.

So even though most traffic stops end without incident, traffic stops are nonetheless inherently risky for police officers. And when, as in this case, the driver suddenly pulls away in the midst of a stop, the risks multiply. A driver speeding away from a traffic stop could easily endanger bystanders and other drivers—especially if the fleeing driver is under the influence of alcohol or drugs, as might well be the case when a driver flees. Moreover, the very "fact that a suspect flees when suspected of a minor offense," such as speeding or a failure to pay tolls, "could well be indicative of a larger danger." *Lange* v. *California*, 594 U. S. 295, 331 (2021) (ROBERTS, C. J., concurring in judgment). Fleeing from the traffic stop could suggest that the driver is preparing to commit or has committed a more serious crime—and is attempting to evade detection or arrest. The driver may have illegal drugs or an illegal gun in the car. Or the driver may be unlawfully in the country and fear removal if apprehended. He might have a warrant out for his arrest. He could have an abducted child in the car. See Tr. of Oral Arg. 18. Or as the tragic 2025 New Year's terrorist attack in New Orleans illustrates, the driver might intend to use the car as a weapon. See *id.*, at 24.

The possibilities are many. But the key point is a commonsense one: A driver who speeds away from a traffic stop can pose significant dangers to both the officer and the surrounding community.

The question when a driver flees, therefore, is not merely whether the underlying traffic violation "presents risks to public safety"—it is also "whether *flight*," and what that flight might indicate or enable, "does so." *Lange*, 594 U. S., at 331 (ROBERTS, C. J., concurring in judgment). In those circumstances, in other words, it is not only the "severity of

the crime" that prompted the stop that is relevant to the "totality of the circumstances" inquiry. *Graham* v. *Connor*, 490 U. S. 386, 396 (1989) (quotation marks omitted). The Fourth Amendment analysis must also take account of the suspect's attempt "to evade" the officer "by flight." *Ibid*.

What should the officer do when a driver flees from a traffic stop? There are no easy or risk-free answers. Every feasible option poses some potential danger to the officer, the driver, or the public at large—and often to all three. And an officer in that situation must make a split-second choice among those various dangerous options.

*First*, the officer could simply let the driver go. But because the fleeing driver might be a threat to the community, letting the driver go may exacerbate the dangers, rather than mitigate them. Encouraging officers to stand back and allow drivers to take off would also create "perverse incentives" for those who are stopped by the police. *Scott* v. *Harris*, 550 U. S. 372, 385 (2007). If doing nothing in response to a fleeing driver became a known and regular practice among police officers, that would presumably embolden some drivers who otherwise might have thought twice about taking off.

Of course, the officer could let the driver go in the moment but then attempt to catch the driver by, for example, tracking the car's license plate or reviewing surveillance footage. See Tr. of Oral Arg. 8. But after letting the driver go, the police may not be able to later track down the car or the driver of the car. Even if the police are able to do so, the escaped driver may pose a serious risk to the public in the interim. And given that the driver has already shown a propensity to evade law enforcement by fleeing a traffic stop, attempting to execute an arrest upon finding the driver could itself be dangerous for the police and others.

*Second*, the officer could get back in his police car and give chase, or could radio other officers to pursue the driver. But a high-speed chase likewise can be exceptionally

dangerous to the officer, the driver, and others on the road. "Vehicular pursuits" are "often catastrophic." *Lange*, 594 U. S., at 324 (ROBERTS, C. J., concurring in judgment). Many real-world examples demonstrate as much. *Plumhoff* v. *Rickard* involved a "'dangerous car chase'" in which the driver "tried to outrun as many as six police cruisers at speeds sometimes exceeding 100 miles per hour," ending in the "fatal shooting" of the driver. *Ante*, at 6 (quoting 572 U. S. 765, 768 (2014)). In *Scott* v. *Harris*, multiple police cars "with blue lights flashing and sirens blaring" chased the driver "for nearly 10 miles" while "he ignored their warning to stop," culminating in an officer ramming the driver off the road. 550 U. S., at 384. Moreover, a recent study concluded that a significant percentage of those killed in police chases are not the fleeing drivers but rather are passengers or bystanders. From 2017 through 2022, more than 500 bystanders were reportedly killed as a result of police chases.[3]

*Third*, the officer might try to shoot out the tires of the fleeing car, or otherwise try to hinder the car's movement, in order to bring it to a stop. But shooting at a car, especially its tires, can be "dangerous" and is often "ineffective."[4] Even if the officer manages to hit the tires, the driver could lose control and crash into others on the road. That course of action also poses the risk of the officer accidentally shooting the driver or innocent passengers.

*Fourth*, as happened here, the officer could attempt to stop the fleeing driver at the outset by jumping on or reaching into the car. The dangerousness of that option is readily apparent. Perhaps the driver will hit the brakes once he realizes an officer is clinging to the car or

---

[3] See S. Neilson, J. Gollan, & J. Haseman, First-of-Its-Kind Database: Majority of People Killed in Police Chases Aren't the Fleeing Drivers, San Francisco Chronicle (Feb. 2024).

[4] Los Angeles County Sheriff's Dept., Field Operations Support Services Newsletter: 15–14 – Shooting at Vehicle Tires (2025).

6                BARNES *v.* FELIX

KAVANAUGH, J., concurring

attempting to reach through the window. But if the driver does not slow down, then the officer may suffer serious and perhaps fatal injuries. The officer could try to fire his weapon to incapacitate the driver and bring the car safely to a stop. But the car may be just as likely to go careening into traffic, thereby threatening the safety of the officer, other drivers, passengers, pedestrians, and more.

   I could go on. The point here is that when a driver abruptly pulls away during a traffic stop, an officer has no particularly good or safe options. None of the options available to the officer avoids danger to the community, and all of them require life-or-death decisions that must be made in a few seconds in highly stressful and unpredictable circumstances.

   Of course, when an officer uses force against a fleeing driver, the judiciary still must assess any resulting Fourth Amendment claim under the standard of objective reasonableness. Under this Court's precedents, that inquiry involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U. S., at 396 (quoting *Tennessee* v. *Garner*, 471 U. S. 1, 8 (1985)). In conducting that analysis, judges should keep in mind that it is one thing to dissect and scrutinize an officer's actions with the "20/20 vision of hindsight," "in the peace of a judge's chambers." *Graham*, 490 U. S., at 396 (quotation marks omitted). It is quite another to make "split-second judgments" on the ground, "in circumstances that are tense, uncertain, and rapidly evolving." *Id.*, at 397. In analyzing the reasonableness of an officer's conduct at a traffic stop, particularly traffic stops where the driver has suddenly pulled away, courts must appreciate the extraordinary dangers and risks facing police officers and the community at large.