# United States Court of Appeals for the Fifth Circuit

---

No. 22-20519

---

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2025

Lyle W. Cayce
Clerk

JANICE HUGHES BARNES, *Individually and as Representative of* THE ESTATE OF ASHTIAN BARNES, *Deceased*; TOMMY DUANE BARNES,

*Plaintiffs—Appellants,*

*versus*

ROBERTO FELIX, JR.; COUNTY OF HARRIS, TEXAS,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-725

---

## ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before ELROD, *Chief Judge*, and HIGGINBOTHAM and SMITH, *Circuit Judges*.

PATRICK E. HIGGINBOTHAM, *Circuit Judge*:

As advances of the genre of the Morse code, with its twenty-six letters and ten numerals, railroads, and flight challenged the social order and perforce its legal regime, today we repair to the horseless carriage with its then unimaginable role in daily life, and as with each of the past challenges to the essential task of policing its usage.

No. 22-20519

From a unanimous Supreme Court came pretextual stops, enabling police officers to stop an automobile upon probable cause that any traffic violation has occurred, even if the stop is in search of another violation.[1] Even before that, the Court, aware of the "inordinate risk confronting an officer as he approaches a person seated in a vehicle," had granted officers the right to order the driver out of the vehicle.[2] The import of these decisions cannot be understated, as traffic stops are among the most common interactions the public has with police.

And while *Mimms*'s common-sense protection enables the officer to distance the driver from weapons or contraband in the vehicle, it also prevents a high-speed car chase. The officer's power to preempt flight by separating the suspect from his vehicle is crucial as "[a] driver who speeds away from a traffic stop can pose significant dangers to both the officer and the surrounding community."[3] It follows that the choice to use deadly force in such a situation is "presumptively reasonable when the officer has reason

---

[1] *Whren v. United States*, 517 U.S. 806, 810, 813 (1996) (holding "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred" and rejecting the argument that "the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *accord Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("[O]fficers need only reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." (quotations and citation omitted)).

[2] *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (per curiam) (holding police officer conducting lawful stop for traffic violation may order driver out of vehicle as a matter of course without violating the Fourth Amendment, even if officer has no reason to suspect foul play from driver at time of the stop); *accord Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (confirming *Mimms* rule applies to passengers as well as drivers).

[3] *Barnes v. Felix*, 605 U.S. 73, 87 (2025) (KAVANAUGH, J., concurring).

to believe that the suspect poses a threat of serious harm to the officer or to others."[4]

This well-settled precedent dictates the outcome of this excessive-force case. Deputy Roberto Felix fatally shot Ashtian Barnes on the Sam Houston Tollway. Barnes's parents sued Felix and Harris County under 42 U.S.C. § 1983.[5] The district court granted summary judgment on the plaintiffs' excessive- and deadly-force claims against Felix and their *Monell* claims against Harris County.

Bound by this circuit's "moment-of-threat" rule, we affirmed.[6] Under that doctrine, "[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting," and "any of the officers' actions leading up to the shooting are not relevant."[7] While the Fifth, Second, Fourth, and Eighth Circuits have applied this truncated analysis, the majority of our sister circuits consider the totality of the circumstances in determining the reasonableness of an officer's use of deadly force.[8] A concurring judge on this

---

[4] *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009); *see also Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) (officer may take a life only if it is necessary to prevent an escape and officer has probable cause to believe the suspect poses a significant risk of physical harm to himself or another).

[5] The plaintiffs also brought claims under the Texas Tort Claims Act but have since abandoned them.

[6] *Barnes v. Felix*, 91 F.4th 393, 397–98 (5th Cir. 2024).

[7] *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (alterations in original) (citation omitted); *see also, e.g., Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.").

[8] *See, e.g., St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir. 1995) ("We first reject defendants' analysis that the police officers' actions need be examined for

No. 22-20519

panel urged the Supreme Court to resolve the circuit split over the application of a doctrine deployed daily across this country.[9]

---

'reasonableness' under the Fourth Amendment only at the moment of the shooting. We believe that view is inconsistent with Supreme Court decisions and with the law of this Circuit."); *Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004) ("All of the events leading up to the pursuit of the suspect are relevant."); *Abraham v. Raso*, 183 F.3d 279, 292 (3d Cir. 1999) (considering the totality of circumstances even in the context of deadly force); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) ("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive."); *Est. of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("If a fleeing felon is converted to a 'threatening' fleeing felon *solely* based on the actions of a police officer, the police should not increase the degree of intrusiveness."); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) ("While a Fourth Amendment violation cannot be established 'based merely on bad tactics that result in a deadly confrontation that could have been avoided,' the events leading up to the shooting, including the officers['] tactics, are encompassed in the facts and circumstances for the reasonableness analysis." (citations omitted)); *Fogarty v. Gallegos*, 523 F.3d 1147, 1159–60 (10th Cir. 2008) (considering totality of the circumstances leading up to the use of force, including "whether an officer's own 'reckless or deliberate conduct' in connection with the arrest contributed to the need to use the force employed." (citation omitted)); *Ayers v. Harrison*, 650 F. App'x 709, 719 (11th Cir. 2016) ("[The officer's] argument that our precedent precluded [the plaintiff] from advancing an 'officer created danger' theory at trial is both factually and legally incorrect."); *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) ("[W]hatever the circumstances prompting law enforcement officers to use force, whether it be self-defense, defense of another or resistance to arrest, where, as here, a [F]ourth [A]mendment violation is alleged, the inquiry remains whether the force applied was reasonable."). *But see Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) ("[The officer's] actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force."); *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) ("[T]he reasonableness of the officer's actions in creating the dangerous situation is not relevant to the Fourth Amendment analysis; rather, reasonableness is determined based on the information possessed by the officer at the moment that force is employed." (citations omitted)); *Banks v. Hawkins*, 999 F.3d 521, 525–26 (8th Cir. 2021) ("In any event, we evaluate the reasonableness of [the officer's] conduct by looking primarily at the threat present *at the time* he deployed the deadly force." (citation omitted)).

[9] *Barnes*, 91 F.4th at 401 (Higginbotham, J., concurring) ("This case should have enjoyed full review of the totality of the circumstances. . . . It is time for this Court to revisit this doctrine, failing that, for the Supreme Court to resolve the circuit divide.").

No. 22-20519

And it did. In a unanimous opinion, the Supreme Court reversed, holding the moment-of-threat rule improperly constrains a court's temporal analysis of whether an officer acted reasonably in using force.[10] The Court found that *Tennessee v. Garner* and its progeny control;[11] any claim "that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard."[12] In doing so, the court must consider the "totality of the circumstances."[13]

Four justices also concurred in a separate writing of JUSTICE KAVANAUGH, in which he emphasized the weight courts should give to a suspect's flight, however innocuous the initial reason for the stop may be.[14] He stressed the dangers inherent in traffic stops, as officers suffer a "tactical disadvantage when approaching an unknown vehicle, with limited visibility and unpredictable threats," and moreover, how the dangers to the public and police "multiply" when a driver flees.[15] "[N]o easy or risk-free answers" present themselves when a driver takes off.[16] Letting the driver go endangers

---

[10] *Barnes*, 605 U.S. at 80 ("[T]he 'totality of the circumstances' inquiry into a use of force has no time limit.").

[11] *Id.* at 80–81; 471 U.S. at 8–9.

[12] *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[13] *Id.* at 396 (quoting *Garner*, 471 U.S. at 8–9).

[14] *Barnes*, 605 U.S. at 84–90 (KAVANAUGH, J., concurring).

[15] *Id.* at 85–86 (quotations and citation omitted).

[16] *Id.* at 87.

No. 22-20519

the surrounding community and creates perverse incentives,[17] degrading the respect due to those who protect and serve. Intervention is even more dangerous, whether by giving chase, shooting out the driver's tires, or jumping onto the vehicle.[18] Thus, "[t]he Fourth Amendment [totality of the circumstances] analysis must also take account of the suspect's attempt 'to evade' the officer by 'flight.'"[19] So here, our analysis of Felix's qualified-immunity defense "must appreciate the extraordinary dangers and risks facing police officers and the community at large" when a "driver has suddenly pulled away."[20]

On remand, and with the power of the moment-of-threat doctrine's temporal strictures lifted away, we review *de novo* whether summary judgment is proper in light of the totality of the circumstances leading to Barnes's death.[21] We AFFIRM.

# I.

To establish a Fourth Amendment violation based on an officer's use of excessive force, plaintiffs "must show: (1) an injury[;] (2) which resulted from the use of force that was clearly excessive to the need[;] and (3) the excessiveness of which was objectively unreasonable."[22] The court considers

---

[17] *Id.* ("If doing nothing in response to a fleeing driver became a known and regular practice among police officers, that would presumably embolden some drivers who otherwise might have thought twice about taking off.").

[18] *Id.* at 87–89.

[19] *Id.* at 87 (quoting *Graham*, 490 U.S. at 396).

[20] *Id.* at 90.

[21] *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 490 (5th Cir. 2018) (citation omitted); Fed. R. Civ. P. 56(a).

[22] *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (quotations and citation omitted).

the totality of the circumstances, *i.e.*, "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."[23] This is no cursory review; the court must "slosh [its] way through the factbound morass of reasonableness," careful to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[24]

But when an officer invokes qualified immunity, as here, the burden shifts to the plaintiff to first demonstrate (1) the officer violated a constitutional right and (2) "the unlawfulness of [the officer's] conduct was clearly established at the time."[25] "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."[26]

## II.

The facts giving rise to the plaintiffs' claims unfolded in under two minutes. On April 28, 2016, Deputy Felix patrolled the Sam Houston Tollway as a traffic-enforcement officer for Harris County. A radio broadcast around 2:40 p.m. alerted him to a Toyota Corolla with outstanding toll violations. Felix located and stopped the Corolla on the left shoulder of the

---

[23] *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Graham*, 490 U.S. at 396).

[24] *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotations omitted); *Graham*, 490 U.S. at 396 (quotations and citations omitted).

[25] *Dist. of Columbia. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotations and citation omitted).

[26] *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quotations and citations omitted).

freeway soon thereafter—a reasonable decision given his probable cause to believe a misdemeanor traffic violation had occurred.[27] The dashcam footage shows the Corolla's taillights extinguish while its left blinker remains on, indicating the driver turned the engine off but kept the keys in the ignition.

At 2:43 p.m., Felix exited his vehicle, approached the Corolla, and requested the driver's license and proof of insurance.[28] The driver, Ashtian Barnes, told Felix that he did not have his license and the car was rented in his girlfriend's name. Barnes began to reach around the console and floorboard and rummage through papers.[29] Felix claimed Barnes maintained eye contact with him as he did so, and Barnes stopped after Felix repeatedly told him to "stop digging around." Felix said he smelled marijuana and asked Barnes if there was anything in the car he should know about, and called for backup.[30] Barnes then claimed his identification was in the trunk, and opened

---

[27] Tex. Transp. Code § 370.177(a) ("[T]he operator of a vehicle . . . that is driven or towed through a toll collection facility of a turnpike project shall pay the proper toll. The operator of a vehicle who drives or tows a vehicle through a toll collection facility and does not pay the proper toll commits an offense. An offense under this subsection is a misdemeanor punishable by a fine not to exceed $250."); *see Whren*, 517 U.S. at 810.

[28] Tex. Penal Code § 38.02 (officer has a right to request driver's identifying information and proof of insurance); *see also Delaware v. Prouse*, 440 U.S. 648, 658–60 (1979) (officer may permissibly check the driver's license and inspect the automobile's registration and proof of insurance during a lawful traffic stop); *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) ("In the course of effectuating [a temporary detention], a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen.").

[29] *See Reese v. Anderson*, 926 F.2d 494, 496, 500–01 (5th Cir. 1991) (refusing to find excessive force where the suspect repeatedly refused to keep hands raised and appeared to be reaching for an object).

[30] The Houston Police Department's investigation of the incident revealed Barnes had a criminal record and a loaded handgun under the driver's seat.

No. 22-20519

it for Felix to retrieve himself. Barnes placed his keys near the gearshift and the blinker turned off.

At 2:45 p.m., exercising his right of self-protection, Felix ordered Barnes to exit the vehicle and placed his right hand on his holster as the door opened.[31] Ignoring Felix's order, Barnes grabbed his keys, started the engine, and began to drive away.[32] Understandably, Felix recognized this conduct as an attempt to flee.[33] Felix said something to the effect of "don't do it."

In that moment, "all that a reasonable police officer could have concluded was that [Barnes] was intent on . . . flight and that, if he [were] allowed to do so, he would . . . pose a deadly threat for others on the road" — the vehicle would enter traffic in the fast-lane of the freeway.[34] Because the very "fact that a suspect flees when suspected of a minor offense could well be indicative of a larger danger," Felix faced a split-second decision between

---

[31] *Mimms*, 434 U.S. at 110–11; *see also United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (officer conducting traffic stop may investigate further upon reasonable suspicion of additional criminal activity); *United States v. Garcia*, 592 F.2d 259, 260 (5th Cir. 1979) (per curiam) (holding that reasonable suspicion "was supplied by the smell of the marijuana"); *United States v. Conley*, No. 22-30037, 2023 WL 2327457, at *3 (5th Cir. Mar. 2, 2023) (per curiam) (unpublished) (same).

[32] *See Young v. City of Killeen*, 775 F.2d 1349, 1351, 1352–53 (5th Cir. 1985) (upholding the use of deadly force when the suspect refused to exit the vehicle and "reached down to the seat or floorboard of his car" as if to retrieve something).

[33] Felix testified he "already had a perception of maybe something, a weapon or him trying to flee at the same moment."

[34] *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014); *see also Barnes*, 605 U.S. at 86 (KAVANAUGH, J., concurring) ("[W]hen, as in this case, the driver suddenly pulls away in the midst of a stop, the risks multiply. A driver speeding away from a traffic stop could easily endanger bystanders and other drivers.").

No. 22-20519

only bad options.[35] Had Felix remained flatfooted on the pavement, Barnes could have started a perilous high-speed chase during rush hour on Houston's busiest toll road—or, even if he did not speed away, he could have seriously injured Felix with the car.[36] If Felix stepped onto the car, he could at least hang on and command Barnes to stop.[37]

Felix mounted the doorsill with one foot, placing his body partially inside the car. Then, as the vehicle accelerated, Felix stepped on with both feet and yelled, "don't f---ing move!" twice. In the little time Felix had to act, and with the little he knew about Barnes, Felix did not act unreasonably in protecting himself and possibly others.[38] Instead, Felix—having spent

---

[35] *Lange v. California*, 594 U.S. 295, 331 (2021) (ROBERTS, C.J., concurring); *see also Barnes*, 605 U.S. at 86 (KAVANAUGH, J., concurring) ("Fleeing from the traffic stop could suggest that the driver is preparing to commit or has committed a more serious crime—and is attempting to evade detection or arrest."); TEX. PENAL CODE § 38.04 (intentionally fleeing from police officer attempting lawful detainment constitutes an offense). Felix testified he "had nothing on Mr. Barnes, not even a name, so I didn't know who he was, what he was capable of or what he could do. So for him trying to flee in this situation definitely threw up a flag that there was something . . . that needed to be stopped."

[36] *See Barnes*, 605 U.S. at 87–89 (KAVANAUGH, J., concurring) (discussing an officer's potential responses to flight, none of which are "particularly good or safe options").

[37] *See id.*

[38] *See Graham*, 490 U.S. at 396–97 ("[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."); *Thompson v. Mercer*, 762 F.3d 433, 438 (5th Cir. 2014) (stating it was the fleeing driver, and not the officer, "who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the [officer's] choice between two evils"); *Davis v. Romer*, 600 F. App'x 926, 930 (5th Cir. 2015) (finding argument that the "officer could have moved away from the car is, unfortunately, a suggestion more reflective of the peace of a judge's chambers than of a dangerous and threatening situation on the street" (cleaned up) (citation omitted)).

No. 22-20519

eleven years on the job with an Advanced Peace Officer license—did exactly what he was trained to do.

As Felix clung to the doorframe of the accelerating car, he withdrew then reinserted his weapon into the passenger compartment toward the driver's seat. Barnes kept driving. Felix shot inside the vehicle, "act[ing] reasonably in using deadly force to end [the] risk [of flight]."[39] And because Barnes still did not stop, Felix acted reasonably in firing a second shot.[40] Felix continued to hold Barnes at gunpoint until backup arrived, and Barnes was pronounced dead at the scene at 2:57 p.m.

Based on the undisputed events depicted in the video and Felix's uncontested sworn testimony, we find, based on the totality of the circumstances, that no genuine dispute of material fact exists as to whether Felix used excessive force in an objectively unreasonable manner at any time in the traffic stop.[41] And because the plaintiffs have failed to satisfy the first

---

[39] *Plumhoff*, 572 U.S. at 777; *see also Young*, 775 F.2d at 1352–53; *Graham*, 490 U.S. at 396–97.

[40] *See Plumhoff*, 572 U.S. at 777 ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

[41] *See* Fed. R. Civ. P. 56(a). The plaintiffs contend material factual disputes exist regarding Barnes's conduct during the stop. Some allegations cannot be independently verified by the dashcam footage and are supported only by Felix's testimony, which the plaintiffs claim varies "wildly." True, Felix has provided several explanations for his conduct, *i.e.*, fear for his life and the safety of others on the road, along with a suspicion that Barnes's flight indicated a more serious crime prompting his evasion. But these reasons are not mutually exclusive. The plaintiffs "provide no evidence to support their skepticism, and at the summary judgment stage, we require evidence—not absolute proof, but not mere allegations either." *Ontiveros*, 564 F.3d at 383 (quotations and citation omitted). Moreover, our inquiry is one of "objective reasonableness," not subjective intent, viewed from "the perspective of a reasonable officer on the scene." *Id.* at 382; *Graham*, 490 U.S. at 396. We need not venture to divine Felix's thoughts; instead,

No. 22-20519

step of the qualified-immunity analysis—raising a dispute of material fact on whether Barnes's Fourth Amendment right to be free from excessive force was violated—we do not reach whether the violated right was "clearly established" at the time of the incident. Accordingly, the plaintiffs have failed to meet their burden to defeat Felix's invocation of qualified immunity, and Felix is entitled to summary judgment on the excessive- and deadly-force claims against him. And as the plaintiffs have failed to show a constitutional violation, their claims against the county fail. Summary judgment is proper as to all claims against Harris County. For the foregoing reasons, we AFFIRM.

––––––––––––––––––––––––––––

we ask whether a reasonable officer under Felix's circumstances would have resorted to deadly force to protect himself and others and to prevent an attempted evasion.